United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

BOARD OF TRUSTEES OF THE PIPE
TRADES DISTRICT COUNCIL NO. 36
HEALTH AND WELFARE TRUST
FUND, et al.,

       Plaintiffs,

      v.

CLIFTON ENTERPRISES, INC., dba
NICHOLS PLUMBING & HEATING, et
al.,

       Defendants.

Case No.: 11-05447 JST (JSC)

**ORDER RE: PLAINTIFFS' MOTION
FOR DEFAULT JUDGMENT**

     In this enforcement action brought under the Employee Retirement Income Security Act ("ERISA"), Plaintiffs bring a Motion for Default Judgment ("Motion") seeking entry of default judgment, an award of outstanding employee benefit contributions, liquidated damages and interest, and an injunction requiring an audit of books and records.  (Dkt. No. 83-1.)  After carefully reviewing the record, and having had the benefit of oral argument on May 23, 2013, the Court Orders as follows.

United States District Court
Northern District of California

## BACKGROUND

Each of the Plaintiffs,[1] except for the Board of Trustees of the Central California Pipe Trades Industry Labor-Management Cooperation Committee Trust Fund ("Labor-Management Fund") was, and is: the Plan Administrator of employee benefit plans within the meaning of Section 3(3) of ERISA; a fiduciary within the meaning of Section 3(2)(A)(iii) of ERISA; and the named fiduciary within the meaning of Section 402 (a)(l) of ERISA.  (Dkt. No. 1 ¶ 4.)  The Labor-Management Fund oversees a joint labor-management trust fund organized pursuant to Section 302(c)(9) of the Labor Management Relations Act ("LMRA") and Section 6(b) of the Labor Management Cooperation Act of 1978 ("LMCA").  (*Id.* at ¶ 5.)  It is likewise a fiduciary of its trust fund.  (*Id.*)

Defendant Clifton Enterprises, Inc., dba Nichols Plumbing & Heating ("Nichols"), an employer within the meaning of ERISA Section 3(5) and 29 U.S.C. § 1002(5), is a signatory to a Master Labor Agreement ("MLA") between the Pipe Trades Council No. 36 of the Association of Journeymen and Apprentices of the Plumbing & Pipefitting Industry of the United States and Canada, AFL-CIO and Mechanical Contractors Council of Central California, and various trust agreements establishing each of the Plaintiffs (collectively, the "Agreements").  (*Id.* at ¶ 14.) Pursuant to the Agreements, Nichols agreed to remit fringe benefit contributions for all work performed by its covered employees, with said payments to be received by Plaintiffs at their place of business on or before the fifteenth calendar day of each successive month.  (*Id.* at ¶ 15.)  "Nichols further agreed that all delinquent contributions, except for contributions owed to [the Labor-Management Fund], shall be subject to liquidated damages in the amount of twenty percent (20%) of the delinquent contributions" if Plaintiffs are forced to initiate legal action upon said contributions. (*Id.* at ¶ 18; *see also* Dkt. No. 83-3 at Art. XIX, Sec. 2.)  In addition, Nichols further agreed that all delinquent contributions and liquidated damages shall be subject to interest at a rate of 12% per annum from the fifteenth calendar day of each successive month.  (Dkt. No. 1 ¶ 19; *see also* Dkt. No. 83-3 at Art. XIX, Sec. 2, Art. XXXIII, Sec. 4.)

---

[1]  These Plaintiffs comprise: 1) Board of Trustees of the Pipe Trades District Council No. 36 Health and Welfare Trust Fund ("Health Fund"); 2) Board of Trustees of the Pipe Trades District Council No. 36 Pension Trust Fund ("Pension Fund"); and 3) Board of Trustees of the Pipe Trades District Council No. 36 Apprentice Training Trust Fund ("Apprentice Fund").

1    The Complaint, filed November 9, 2011, alleges that Nichols has failed to pay contributions

2  due for work performed by its employees totaling $25,266.05.  (*Id.* at ¶ 26.)  These delinquent

3  contributions arise from work performed in December 2010, January 2011, and February 2011.

4  (Dkt. No. 83-2 ¶ 6.)  After filing the Complaint, Plaintiffs conducted an audit of Nichols' financial

5  and payroll records, which determined that Nichols had underreported and underpaid certain fringe

6  benefit contributions for March, April, and May 2011, totaling an additional $23,385.60.  (*See* Dkt.

7  No. 83-1 at 7; *see also* Dkt. No. 83-5 ¶ 4.)

8    The Complaint further alleges that Defendants Barbara Anna Clifton ("Ms. Clifton"), Charles

9  Lee Clifton Sr. ("Mr. Clifton Sr."), Charles Lee Clifton Jr. ("Mr. Clifton Jr."), and Robert Lawrence

10  Clifton ("Mr. R. Clifton")—as individuals who were Nichols' corporate officers or who otherwise

11  exercised authority or control over the management or disposition of said assets—owed a fiduciary

12  duty to Plaintiffs, and may be personally held liable for losses suffered by the plan with respect to 1)

13  amounts that were withheld from employees' wages by an employer for contribution to the plan

14  (employee contributions), and 2) contributions owed for the use of non-union labor.  (Dkt. No. 1 ¶¶

15  8-11, 41, 44.)[2]  In addition, Defendant C R B Enterprises Monterey Inc., dba Nichols Plumbing &

16  Heating ("CRB"), identified in the Complaint as DOE 1, is "likewise liable for all monies owed,

17  either as the directors or shareholders of Nichols, persons certifying the monthly contribution

18  reports, alter egos, double-breasted shops or some other theory of liability."  (*Id.* at ¶ 29; *see also*

19  Dkt. No. 83-1 at 6-7.)

20    Defendants failed to answer or otherwise appear and Defendants' default was entered by the

21  Clerk pursuant to Rule 55(a) of the Federal Rules of Civil Procedure.  (*See* Dkt. Nos. 17 (Clifton

22  Enterprises, Inc., dba Nichols, Ms. Clifton, Mr. Clifton Jr., and Mr. R. Clifton), 32 (Mr. Clifton Sr.),

23  and 69 (CRB).)  Plaintiffs filed the present Motion on March 29, 2013.  In the Motion, Plaintiffs

24  request: 1) an order directing Defendants to pay $65,830.16 in unpaid contributions, liquidated

25  damages, and interest; and 2) an order requiring that CRB submit to an audit.  (Dkt. No. 83-1 at 18.)

26  Plaintiffs served Defendants with the Motion by mail.  (Dkt. No. 83-7.)  With the exception of Mr.

27
28
---
[2]  After Plaintiffs filed their present motion, Mr. R. Clifton filed a notice of a stay of proceedings due to his bankruptcy filing.  (Dkt. No. 88.)  Plaintiffs do not oppose the notice.  (Dkt. No. 91.)  Thus, these proceedings should be stayed as to Mr. R. Clifton pending resolution of his bankruptcy filing.

1    R. Clifton, Defendants have not appeared or responded to the Motion, and the deadline for opposing

2    the motion has passed.  *See* Civil L.R. 7-3(a).

3                                            **DISCUSSION**

4    **I.      Jurisdiction and Service of Process**

5            When a court is considering whether to enter a default judgment it has "an affirmative duty to

6    look into its jurisdiction over both the subject matter and the parties."  *In re Tuli*, 172 F.3d 707, 712

7    (9th Cir. 1999).  Here, the Court has subject matter jurisdiction pursuant to 29 U.S.C. § 1132

8    (empowering ERISA plan fiduciaries to bring civil actions to enforce plan terms).  The Court has

9    personal jurisdiction because Nichols and CRB are California corporations that engage in business

10   activities in the Northern District of California.  Personal jurisdiction over the individual Defendants

11   arises from service upon those individuals in California.  (*See* Dkt. Nos. 10, 12, 13, 18); *Burnham v.*

12   *Super. Ct.*, 495 U.S. 604, 610–11 (1990).

13          A court is also required to "assess the adequacy of the service of process on the party against

14   whom default is requested."  *Bd. of Trs. of the N. Cal. Sheet Metal Workers v. Peters*, No. 00–0395,

15   2000 U.S. Dist. LEXIS 19065, at *2 (N.D. Cal. Jan. 2, 2001).  Federal Rule of Civil Procedure 4(e)

16   provides that service in accordance with California law is proper.  Under California law, a

17   corporation may be served by delivering a copy of the summons and of the complaint to the person

18   designated as agent for service of process.  *See* Cal. Civ. P. Code § 416.10(a).  Here, Nichols' and

19   CRB's agents for service of process were personally served with the Summons and Complaint.

20   (Dkt. Nos. 11 (Nichols), 63 (CRB).)  In addition, each of the four individually named Defendants

21   were personally served with the Summons and Complaint pursuant to California law.  *See* Cal. Civ.

22   P. Code § 415.10.

23   **II.     Default Judgment**

24          After entry of default, a court may grant default judgment on the merits of the case.  *See* Fed.

25   R. Civ. P. 55.  The factual allegations of the complaint, except those concerning damages, are

26   deemed to have been admitted by the non-responding party.  *Geddes v. United Fin. Grp.*, 559 F.2d

27   557, 560 (9th Cir. 1977).  "The district court's decision whether to enter a default judgment is a

28

discretionary one." *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980).  A court should consider the following factors in determining whether to enter default judgment:

> (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

*Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986).

The majority of the *Eitel* factors support default judgment.  First, if the Motion were to be denied, then Plaintiffs would likely be left without a remedy given Defendants' failure to appear or otherwise defend this action.  *See Pepsico, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002).  Second, because Defendants have not answered the Complaint or otherwise appeared in this action, the possibility of a dispute concerning material facts is unknown.  Third, Plaintiffs properly served Defendants and there is no evidence in the record that Defendants' failure to appear and otherwise defend this action was the result of excusable neglect.  Fourth, the sum of money being sought by Plaintiffs is reasonable in that it is tailored to the specific misconduct of Defendants; namely, Defendants' failure to pay the contributions, which they allegedly assumed responsibility for under the MLA.  *See Pepsico*, 238 F. Supp. 2d at 1176 (stating that "the court must consider the amount of money at stake in relation to the seriousness of Defendant's conduct").  Finally, although the seventh *Eitel* factor, which favors decisions on their merits, weighs against default judgment, the Court finds that this factor is not dispositive.

Having determined that on balance the *Eitel* factors discussed above support Plaintiffs' Motion, the Court turns to the merits of Plaintiffs' substantive claims and the sufficiency of the evidence (the second and third *Eitel* factors).  These factors essentially require Plaintiffs to state a claim on which it may recover.  *Danning v. Lavine*, 572 F.2d 1386, 1388 (9th Cir. 1978).  Plaintiffs' Complaint seeks a finding of liability as to Nichols, the individual Defendants, and CRB.

A.      **Nichols**

Plaintiffs claim that Nichols violated ERISA by failing to provide timely payments and reports pursuant to the MLA.  These allegations are sufficient to state a claim under Federal Rule of

United States District Court
Northern District of California

1  Civil Procedure 8(a).  *See* 29 U.S.C. § 1145 ("Every employer who is obligated to make contributions

2  to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained

3  agreement shall, to the extent not inconsistent with law, make such contributions in accordance with

4  the terms and conditions of such plan or such agreement.").  The claims are further substantiated by

5  the factual record.  As discussed above, Plaintiffs have offered evidence that Nichols entered into the

6  MLA.  The MLA, through the Agreements, imposes liability on delinquent employers for liquidated

7  damages, unpaid interest and attorney's fees in addition to any unpaid contributions.  Plaintiffs'

8  Complaint alleges that Nichols has failed to pay contributions due for work performed by its

9  employees during the months of December 2010 through February 2011.  (Dkt. No. 1 at ¶ 24.)  In

10  addition, Nichols has failed to report or pay contributions for the months of March 2011 through May

11  2011.  (*See* Dkt. No. 83-5.)  Plaintiffs have provided adequate documentation supporting these

12  allegations.  (*See* Dkt. No. 83-4, Ex. C (Nichols' Report of Contributions for Dec. 2010 through Feb.

13  2011); *see also* Dkt. No. 83-5 (audit report of Nichols' unreported and unpaid hours for Mar. 2011

14  through May 2011).)  In addition, Plaintiffs provide an accounting of liquidated damages incurred by

15  Plaintiffs in support of the Motion.  (*See* Dkt. No. 83-2 ¶ 8.)  Accepting all factual allegations as true,

16  Plaintiffs have stated a claim for relief.

17       Nichols breached its agreement with Plaintiffs when it failed to report or pay contributions

18  for the periods listed above.  Nichols' default triggered the filing of the instant suit for recovery, in

19  response to which Nichols has taken no action.  Based on the foregoing, Plaintiffs are entitled to

20  default judgment on this claim against Nichols.

21       **B.       The Individual Defendants**

22       Plaintiffs also seek default judgment against Defendants Ms. Clifton, Mr. Clifton Sr., and Mr.

23  Clifton Jr. as individuals liable for all of Nichols' unpaid contributions.[3]  Plaintiffs present two

24  arguments regarding individual liability.  First, Plaintiffs posit that each individual Defendant is liable

25  pursuant to a specific provision in the MLA that defines "Individual Employer."  Second, Plaintiffs

26  assert that three of the four Trust Agreements identify unpaid employer contributions as plan assets

27  

28  [3]  As noted above, the proceedings against Mr. R. Clifton are stayed pending bankruptcy proceedings.
(Dkt. No. 91.)

United States District Court
Northern District of California

1    and that the individual Defendants exercised actual control over those assets.  Although Plaintiffs'

2    first argument fails, Plaintiffs' second argument succeeds in part.

3         As a threshold matter, Plaintiffs' motion for default goes beyond what Plaintiffs claimed in the

4    Complaint.  Specifically, Plaintiffs' Complaint alleges a single claim against the individual

5    Defendants: breach of fiduciary duty with respect to their management or disposition of 1) amounts

6    that were withheld from an employee's wages by an employer for contribution to the plan (employee

7    contributions), and 2) contributions owed for the use of non-union labor.  (Dkt. No. 1 ¶¶ 8-11, 41, 44.)

8    Plaintiffs' Complaint does *not* claim that the individual Defendants are personally liable for unpaid

9    employer contributions beyond those amounts owed for use of non-union labor.  The claim for failure

10   to pay all required contributions is made against only Nichols and the Doe defendants.  (*Id.* at ¶¶ 23-

11   30.)  Plaintiffs nonetheless baldly request that the Court find the individual Defendants jointly and

12   severally liable for *all* the amounts Nichols owes.  Plaintiffs do not explain why the Court should find

13   the scope of liability so broad even though the allegations in the Complaint did not put the individual

14   Defendants on notice.

15        At the hearing, Plaintiffs argued that the fiduciary duty claim does allege that the individual

16   Defendants are liable for all unpaid employer contributions, citing to a reference to "delinquent fringe

17   benefit contributions" in paragraph 44.  (*Id.* at ¶ 44.)  However, read in context, "delinquent fringe

18   benefit contributions" refers to unpaid employee contributions, not employer contributions.  As noted

19   above, paragraph 41 identifies two kinds of plan assets: employee contributions and contributions

20   owed for the use of non-union labor.  Paragraphs 42 and 43, respectfully, discuss these two types of

21   contributions only.  Then, in paragraph 44, Plaintiffs allege that the individual Defendants

22        exercised authority or control over the disposition of all of *those* contributions (the
23        delinquent fringe benefit contributions and the contributions owed for the non-union
         labor), or that they have the formal or practical authority to direct others to do so.  As
24        such, said defendants owed fiduciary duties to Plaintiffs to transfer said contributions
         to the latter within the time required by the Agreements.
25

26   (*Id.* (emphasis added).)  Because paragraph 44 refers to "those contributions," yet does not explicitly

27   refer to the employee contributions just previously discussed in paragraphs 41 and 42, the only logical

28   conclusion is that "delinquent fringe benefit contributions" as used in paragraph 44 refers to the just-

United States District Court
Northern District of California

1  discussed employee contributions.  If Plaintiffs wish to seek all unpaid employer contributions from

2  the individual Defendants, the operative complaint must allege as much.  *See* Fed. R. Civ. P. 54(c)

3  ("A default judgment must not differ in kind from, or exceed in amount, what is demanded in the

4  pleadings.").

5          The Court accordingly recommends that any individual liability imposed on the individual

6  Defendants is commensurate to their liability as alleged in the Complaint; that is, unpaid employee

7  contributions and unpaid employer contributions for the use of non-union labor.  Plaintiffs, however,

8  have failed to inform the Court of the amount of unpaid employee contributions or to even specify

9  whether their motion seeks such unpaid contributions.  In addition, Plaintiffs do not delineate between

10  unpaid employer contributions for the use of non-union labor and unpaid employer contributions

11  incurred for other reasons.

12                  **1.      Liability under the MLA**

13          Courts have found defendants individually liable for, among other things, unpaid contributions

14  "[w]here a collective bargaining agreement specifically provides for personal liability of a corporate

15  officer."  *Emp. Painters' Trust Health & Welfare Fund v. Bessey*, 2009 WL 3347588, at *3 (W.D.

16  Wash. Oct. 15, 2009).  It is generally required that the corporate officer have executed the document

17  binding him or her to the terms of the collective bargaining agreement to be held personally liable.

18  *See Emp. Painters' Trust Health & Welfare Fund v. Landon Const. Grp.*, 2011 WL 5864648, at *3

19  (W.D. Wash. Nov. 22, 2011) (collecting cases and finding that "where courts have considered

20  whether to uphold personal liability provisions in collective bargaining agreements, the question of

21  whether the officer at issue signed the contract has been a key consideration").

22          Plaintiffs contend that the following MLA provision defining "Individual Employer" imposes

23  liability on all individual Defendants:

24          The term "I/E" (for Individual Employer) as used in this Agreement means:

25          . . .

26          Any person, firm, corporation or other entity which joins or participates with, or in any
           way assists, directly or indirectly, an Individual Employer as defined above, in evading
           or violating the requirements of Article I, Section 5 or Article XXIX, Section 1.

27

28

8

United States District Court
Northern District of California

1    (Dkt. No. 83-3 at Art. I, Sec. 3.)[4]  This provision imposes no such liability.  The language of the

2    provision is vague and overbroad; read literally, it treats as a potential "Individual Employer" not only

3    company officers, but also the company's secretary, so long as he or she "in any way assists, directly

4    or indirectly," an Individual Employer's misconduct.  Moreover, the provision does not use the phrase

5    "individually liable" or "personally liable."  Plaintiffs cite no authority, and the Court finds none,

6    where a similar provision has been applied to impose personal liability.  Indeed, in ERISA cases

7    where personal liability provisions have been enforced, the provisions explicitly and unambiguously

8    impose individual liability on corporate officers only.  *See Emp. Painters' Trust v. J & B Finishes*, 77

9    F.3d 1188, 1190, 1192 (9th Cir. 1997) (enforcing "explicit and unambiguous" corporate officer

10   personal liability provision); *Bay Area Painters v. Jacobs*, 2003 WL 1139547, at *3 (N.D. Cal. Mar.

11   07, 2003) ("The individual whose signature appears below on behalf of the employer, agrees to be

12   personally and individually liable for said contributions"); *Bessey*, 2009 WL 3347588, at *2 ("[I]n the

13   event any corporate participating Employer which is obligated to make contributions to the Trust fails

14   to make such contributions, the President, the Treasurer, and any other corporate officer who is

15   responsible for payment of contributions by the corporation to the Trust Fund shall be each

16   individually liable for the payment of contributions . . . ."); *Emp. Painters' Trust Health & Welfare*

17   *Fund v. Seattle Structures, LLC*, 2012 WL 4511625, at *1, 3 (W.D. Wash. Oct. 2, 2012) (same).

18   Because the MLA does not provide for individual liability of corporate officers, the MLA does not by

19   itself impose liability on any individual Defendant.  Further, Ms. Clifton is the only individual

20   Defendant who executed the document that bound Nichols to the MLA.  Thus, even if the provision

21   were explicit and unambiguous, it would apply at most to Ms. Clifton.

22            **2.       Liability as fiduciaries under the Trust Agreements**

23            Plaintiffs argue that three of the four underlying Trust Agreements also impose fiduciary

24   liability on the individual Defendants.  The Court agrees in part.

25   _____

26   [4]  Article I, Section 5 requires, among other things, application of the terms and conditions of the
     MLA to "any on-site construction" performed by the Individual Employer.  Article XXIX, Section 1
27   provides that each party to the MLA, including Individual Employers, shall not "take any action that
     will prevent or impede it in the full and complete performance of each and every term and condition
28   hereof."

9

United States District Court
Northern District of California

1    Defendants in an ERISA action can be individually liable where they are fiduciaries of the

2    employee benefit plans.  *See Yeseta v. Baima*, 837 F.2d 380, 383–384 (9th Cir. 1988).  ERISA

3    provides, in relevant part, that "a person is a fiduciary with respect to [an employee benefit] plan to

4    the extent he exercises any discretionary authority or discretionary control respecting management of

5    such plan or exercises any authority or control respecting management or disposition of its *assets*."

6    29 U.S.C. § 1002(21)(A)(i) (emphasis added).   In general, *employer* contributions that are owed

7    pursuant to a collective bargaining agreement do not become plan assets until they are paid over to the

8    Trust.  *See Cline v. Industrial Maintenance Eng'g & Contr. Co.*, 200 F.3d 1223, 1234 (9th Cir. 2000)

9    ("Until the employer pays the employer contributions over to the plan, the contributions do not

10   become plan assets over which fiduciaries of the plan have a fiduciary obligation; this is true even

11   where the employer is a fiduciary of the plan.").  There is a "commonly applied exception" to this

12   rule, which allows unpaid contributions to be treated as assets where "the plan document itself

13   identifies unpaid employer contributions as a plan asset."  *Bos v. Bd. of Trs. of Carpenters Health &*

14   *Welfare Trust Fund for Cal.*, 2013 WL 943520, at *3 (E.D. Cal. Mar. 11, 2013) (collecting cases).  In

15   contrast, *employee* contributions to benefit plans that are withheld by their employer from their wages

16   are plan assets, even if not yet delivered to the plan.  *See* 29 C.F.R. § 2510.3-102(a) ("[T]he assets of

17   the plan include amounts (other than union dues) that a participant . . . pays to an employer, or

18   amounts that a participant has withheld from his wages by an employer, for contribution to the

19   plan."); *see also Nelson v. EG & G Energy Measurements Grp., Inc.*, 37 F.3d 1384, 1391 (9th Cir.

20   1994) (holding that in light of 29 C.F.R. 2501.3-102(a) "the employee contributions should have been

21   considered plan assets at the time they could reasonably have been segregated").

22   Plaintiffs filed with the Court what they assert are the underlying Agreements for three of the

23   four trust funds.  However, one of the Agreements governs the "Pipe Trades District Council No. 36

24   *Journeyman and* Apprenticeship Training Trust Fund,"[5] which does not appear involved in this case.

25   (*See* Dkt. No. 96 at 4 (emphasis added).)  Rather, "Pipe Trades District Council No. 36

26   Apprenticeship Training Trust Fund" is the trust fund that is a party to this case.  While they may be

27   the same party, the current record does not explain the discrepancy in names.  Regarding the other two

28   

_____

[5]  The other two trust funds are the Health Fund and the Pension Fund.

10

1    trust funds, Plaintiffs have identified language in the relevant Trust Agreements that render unpaid

2    contributions plan assets.  Specifically, the Health Fund's Trust Agreement provides that the "Fund

3    shall consist of all payments required to be made into this Fund by any collective bargaining

4    agreement . . . and all interest and other returns thereon of any kind whatsoever."  (Dkt. No. 96-2, Ex.

5    D at Art. II, Sec.1.B.)  In addition, the Pension Fund's Trust Agreement states that the trust fund

6    "shall consist of all payments required to be made into this Trust and all interest, income and other

7    returns thereon of any kind whatsoever."  (Dkt. No. 96-2, Ex. E at Art. II, Sec.1.A.)  The term

8    "required to be made" is sufficient in identifying unpaid contributions as plan assets.  *See Bd. of Trs.*

9    *of Laborers Health & Welfare Trust Fund for N. Cal. v. Atoll Topui Island, Inc.*, 2007 WL 174409, at

10    *7 (N.D. Cal. Jan. 22, 2007) ("This language encompasses contributions that are due (required to be

11    made) but that have not yet been paid.").  Thus, Plaintiffs have shown that unpaid employer

12    contributions are plan assets as to the Health Fund and the Pension Fund, but not as to the Apprentice

13    Fund.[6]

14        In addition to establishing that unpaid contributions are plan assets, Plaintiffs must adequately

15    allege that each of the individual Defendants exercised some "authority or control respecting

16    management or disposition of its assets."  29 U.S.C. § 1002(21)(A)(i).  ERISA Section 3(21)(A) has

17    been interpreted as requiring "a broad definition of fiduciary."  *See Ariz. State Carpenters Trust Fund*

18    *v. Citibank*, 125 F.3d 715, 720 (9th Cir. 1997); *Bd. of Trs. of the Air-conditioning & Refrigeration*

19    *Indus. Health and Welfare Trust Fund v. J.R.D. Mech. Servs., Inc.*, 99 F. Supp. 2d 1115, 1120 (C.D.

20    Cal. 1999) ("Unlike the common law definition under which fiduciary status is determined by virtue

21    of the position a person holds, ERISA's definition is functional.") (internal quotation marks omitted);

22    *see also Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113 (1989) ("[O]ne is a fiduciary to the

23    extent he exercises *any* discretionary authority or control.").   "[A] person's actions, not the official

24

25    _____

26    [6]  Even if the trust agreement submitted by Plaintiffs were the trust agreement for the Apprentice
    Fund, that trust agreement does not treat unpaid employer contributions as plan assets.  In contrast to

27    the Health Fund's and the Pension Fund's Trust Agreements, the purported agreement for the
    Apprentice Fund states that "[t]he Fund shall consist of all payments *made* into the fund."  (Dkt. No.

28    96-2, Ex. F at Art. II, Sec. 2.3 (emphasis added).)  The provision thus allows only those payments that
    are actually made to be deemed plan assets.

1    designation of his role, determine whether he enjoys fiduciary status." *Acosta v. Pac. Enters.*, 950

2    F.2d 611, 618 (9th Cir. 1992).

3              Plaintiffs' allegations are adequate as to each individual Defendant.  In detailing their breach

4    of fiduciary duty claim, Plaintiffs allege that with respect to employee contributions and certain

5    unpaid employer contributions (amounts owed for non-union work) the individual Defendants

6    "exercised authority or control over the disposition of all of those contributions . . . or that they have

7    the formal or practical authority to direct others to do so."  (Dkt. No. 1 ¶ 44.)  Further, the allegation

8    specific to Ms. Clifton states that she "was the [CEO] and President of Nichols for the entire time at

9    issue herein, or that she otherwise exercised discretionary authority and control over the management

10   and disposition of monies and other assets by, or on behalf of, Nichols."  (Dkt. No. 1 ¶ 8.)  In

11   addition, a publicly available California Department of Consumer Affairs' website represents that Ms.

12   Clifton has been CEO and President of Clifton Enterprises since 1998.  (*See* Dkt. No. 96-1, Ex. B.)

13   Ms. Clifton was also the company's signatory to the MLA, demonstrating that she had at least some

14   control over the unpaid contributions.  Regarding Mr. Clifton Sr. and Mr. Clifton Jr., the allegations

15   are likewise sufficient.  (*See* Dkt. No. 1 ¶ 9 (alleging that Mr. Clifton Sr. "was an officer of Nichols

16   for the entire time at issue herein, or that he otherwise exercised discretionary authority and control

17   over the management and disposition of monies and other assets by, or on behalf of, Nichols"), ¶ 10

18   (alleging that Mr. Clifton Jr. "was the Responsible Managing Officer of Nichols for the entire time at

19   issue herein, or that he otherwise exercised discretionary authority and control over the management

20   and disposition of monies and other assets by, or on behalf of, Nichols"); *see also* Dkt. No. 96-1, Ex.

21   B (designating Mr. Clifton Sr. as "officer" and Mr. Clifton Jr. as "RMO").)  Taken together, the

22   allegations, which are established as true due to the individual Defendants' failure to respond to them,

23   adequately allege that the individual Defendants exercised some authority and control over the unpaid

24   contributions in their roles at the company.

25              The Court accordingly recommends that default judgment on Plaintiffs' fiduciary duty claim

26   be granted as to unpaid employee contributions and unpaid amounts for non-union work due to the

27   Health Fund and the Pension Fund.

28

United States District Court
Northern District of California

### C.   CRB

Plaintiffs also contend that CRB, identified in the Complaint as DOE 1, is "likewise liable for all monies owed, either as the directors or shareholders of Nichols, persons certifying the monthly contribution reports, alter egos, double-breasted shops or some other theory of liability."  (Dkt. No. 1 ¶ 29; *see also* Dkt. No. 83-1 at 6-7.)  Plaintiffs' Motion narrows these various theories of liability to CRB's role as the "alter-ego and double-breasted shop of Nichols."  (Dkt. No. 83-1 at 15.)  The Complaint, however, does not include any factual allegations to support their legal conclusion that CRB is somehow liable for Nichols' unpaid contributions.  In determining liability after a defendant's default has been entered, the Court deems only those allegations that are *well-pled* as true.  *See Fair Hous. of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002); *see also Cripps v. Life Ins. Co. of N. Am.*, 980 F.2d 1261, 1267 (9th Cir. 1992) ("[N]ecessary facts not contained in the pleadings, and claims which are legally insufficient, are not established by default.").  Accordingly, the Court ordered Plaintiffs to show cause ("OSC") as to why CRB should be found jointly and severally liable for Nichols' unpaid contributions notwithstanding that the Complaint is devoid of well-pled factual allegations regarding CRB's status as Nichols' alter-ego and/or "double-breasted shop."

Plaintiffs' response to the OSC includes new factual allegations and legal analysis regarding CRB's liability.  (*See* Dkt. No. 96 at 5-8.)  Rule 55 provides that "[t]he court may conduct hearings or make referrals . . . [to] establish the truth of any allegation by evidence."  Fed. R. Civ. P. 55(b)(2)(C).  Thus, while CRB's liability is not established through its default, the Court may accept affidavits and other evidence to establish the truth of Plaintiffs' allegations.

Accepting Plaintiffs' evidence submitted outside the Complaint, the Court concludes that Plaintiffs have established that CRB is liable for Nichols' debts as Nichols' alter ego.  Regarding Plaintiffs' theories of liability, the Ninth Circuit has stated:

> There are two related but distinct theories, the alter ego and single employer doctrines, that prevent contractors from using double-breasted operations to avoid collective bargaining obligations.  Both theories, which overlap substantially, require the district court first to determine whether the two entities are a single employer.  This determination entails examining the degree of common ownership, management,

operations, and labor relations.  If the threshold single employer requirement is met, the next step depends on the theory of liability pursued.

*S. Cal. Painters & Allied Trades, Dist. Council No. 36 v. Rodin & Co.*, 558 F.3d 1028, 1031-32 (9th Cir. 2009) (internal quotation marks and citations omitted); *see also UA Local 343 v. Nor-Cal Plumbing, Inc.*, 48 F.3d 1465, 1471 (9th Cir. 1995).  "Double-breasted operations are those in which the same contractor owns both union and non-union companies.  Double-breasting is legal as long as it is not engaged in for the purpose of avoiding collective bargaining obligations."  *S. Cal. Painters*, 558 F.3d at 1031 n.2 (citations omitted).

### 1.    Single employer

As explained above, both the alter ego theory and single employer theory require a threshold finding that the two employers are a single employer.  "The criteria for determining whether two firms constitute a single employer are (1) common ownership, (2) common management, (3) interrelation of operations, and (4) centralized control of labor relations."  *Nor-Cal*, 48 F.3d at 1471. "No one factor is controlling nor need all criteria be present.  The most important factor is centralized control of labor relations, which can be demonstrated either by showing common control of day-to-day labor matters, or by showing that the person in charge of the union company's labor relations made the decision that the second company would be non-union."  *Id.* (internal citations omitted).

The Court concludes that Plaintiffs have established that each of the factors is present. Regarding common ownership, the webpage print-outs from the California Department of Consumer Affairs website shows that Mr. Clifton Jr. owns 10% or more of both Nichols and CRB.  (Dkt. No. 96-1, Ex. A.)  The companies also share common management in that Ms. Clifton is CEO and President of Nichols as well as an officer of CRB; Mr. Clifton Jr. is the Responsible Managing Officer ("RMO") of Nichols as well as the RMO, CEO, and President of CRB.  (*Id.* at Ex. B.)  The operations of the companies are interrelated because both companies purport to be doing business as "Nichols Plumbing & Heating," (*id.* at Ex. A), they share the same purpose of providing residential plumbing services, (*id.* at ¶ 12), the licenses for both entities share identical classifications, (*id.* at Ex. A), Ms. Clifton and Mr. Clifton Jr. are contractors licensed with both entities, (*id.* at Ex. C), and

United States District Court
Northern District of California

1    there is some evidence that the companies shared, at least for a time, the same business address (*id.*

2    at ¶ 9).  Finally, regarding the centralized control of labor relations, Plaintiffs submit the declaration

3    of Mario Maciel, a business agent and organizer for UA Local 62, who testifies based on information

4    and belief that Mr. Clifton Jr. "managed and oversaw the activities" of Nichols and Mr. Clifton Jr.

5    "performs those same duties at CRB/Nichols."  (*Id.* at ¶ 14.)  Given Mr. Clifton Jr.'s centrality to

6    both entities, it is logical to infer from the record that Mr. Clifton Jr. was responsible for both

7    entities' day-to-day labor matters.

8                    **2.    Alter ego theory**

9            Plaintiffs must not only make the threshold showing that the two firms constituted a single

10   employer, "but also must show that [CRB] was created in an attempt to avoid the obligations of

11   [Nichols'] collective bargaining agreement through a sham transaction or a technical change in

12   operations."  *Nor Cal*, 48 F.3d at 1472; *see also S. Cal. Painters*, 558 F.3d at 1032 (internal

13   quotation marks omitted) ("The alter ego doctrine is designed to prevent employers from escaping

14   their collective bargaining obligations by shifting work to non-union firms they also own.").  "The

15   alter ego doctrine applies if two entities function as a single employer and the non-union entity is

16   being used in a sham effort to avoid collective bargaining obligations, . . . rather than for the pursuit

17   of legitimate business objectives untainted by union animus."  *S. Cal. Painters*, 558 F.3d at 1032

18   (internal quotation marks omitted); *see also Resilient Floor Covering Pension Fund v. M&M*

19   *Installation, Inc.*, 630 F.3d 848, 854 (9th Cir. 2010) (recognizing that while the alter ego test set out

20   in *Nor Cal* is normally applied to bind the non-union employer to the signatory's continuing CBA,

21   the test may also be applied to oblige the non-union employer to pay the signatory's debts).  Finally,

22   the alter ego doctrine "usually comes into play when a new legal entity has *replaced* the

23   predecessor."  *Stardyne, Inc. v. N.L.R.B.*, 41 F.3d 141, 152 (9th Cir. 1994).

24           The record sufficiently establishes that CRB was created in an attempt to avoid Nichols'

25   unpaid contributions.  CRB was formed only after Plaintiffs, in a previous action, filed suit against

26   Nichols seeking unpaid contributions under ERISA.  (*See* Dkt. No. 96-1 ¶ 18.)  That is, the state

27   license board issued CRB's contractor's license on August 2, 2011; Plaintiffs filed suit against

28   Nichols on February 10, 2011.  (*See id* at ¶ 18 & Ex. A.)  Nichols failed to appear in that case and

15

1  default judgment was entered against it.  *See* Case No. 11-00463, Dkt. Nos. 11, 51.  Given the timing

2  of CRB's formation, in addition to the almost identical nature and composition of the two

3  enterprises, the Court concludes that CRB was established in an attempt to continue Nichols'

4  operations while avoiding Nichols' liability for failure to abide by its collective bargaining

5  obligations.  The alter ego doctrine operates to prevent precisely such an evasion.

6       Because the Court concludes that CRB is Nichols' alter ego, the court recommends that CRB

7  be found liable for Nichols' unpaid contributions.

8                      **3.    Single employer theory**

9       Because the Court has already found that CRB is liable as Nichols' alter ego, the Court need

10  not decide whether CRB is also liable under the single employer doctrine.

11  **III.    Damages, Attorney's Fees, and Audit**

12       Once a court has determined default liability, the plaintiff must then establish that the

13  requested relief is appropriate.  *See Geddes*, 559 F.2d at 560.  Under ERISA, an employee benefit

14  plan that obtains judgment in its favor in an action under 29 U.S.C. § 1132 shall be entitled to the

15  following forms of relief: (1) unpaid contributions; (2) interest on the unpaid contributions; (3)

16  liquidated damages, not in excess of 20% of the unpaid contributions; (4) reasonable attorney's fees

17  and costs; and (5) other legal or equitable relief in the discretion of the court.  *See* 29 U.S.C. §

18  1132(g)(2) (stating that the court "*shall* award" these types of relief) (emphasis added).  The Court

19  must use its discretion and consider Plaintiffs' requested relief in light of the statute.

20       **A.    Damages**

21       Plaintiffs seek to recover unpaid contributions for the following months: December 2010

22  ($10,273.05); January 2011 ($7,342.80); February 2011 ($7,650.20); March 2011 ($7,737.20); April

23  2011 ($9,268.40); May 2011 ($6,380.00).  (*See* Dkt. No. 83-1 at 10; Dkt. No. 83-4, Ex. C; Dkt. No.

24  83-5.)  The unpaid contributions for March through May 2011 were not specifically alleged in the

25  Complaint, having been discovered through an audit of Nichols' records in June 2012.  (*See* Dkt. No.

26  83-5 ¶ 4.)  The Court may nonetheless award Plaintiffs those delinquent contributions along with

27  those unpaid contributions included in the Complaint.  The Complaint gave Defendants notice that

28  Plaintiffs were seeking compliance with its audit request, and that Defendants would be expected to

United States District Court
Northern District of California

16

pay further past-due amounts discovered by the audit.  (*See* Dkt. No. 1 ¶ 22.)  Nonetheless, Defendants still failed to appear or otherwise defend themselves in this action.  In addition, courts routinely retain jurisdiction in ERISA default judgment actions so that plaintiffs "may submit further motions and declarations after the audit as to amounts owed."  *Walters v. Shaw/Guehnemann Corp.*, 2004 WL 1465721, at *3 (N.D. Cal. Apr. 15, 2004); *see also, e.g., Bd. of Trs. v. KMA Concrete Constr. Co.*, 2011 WL 7446345, at *6 (N.D. Cal. Dec. 20, 2011) (retaining jurisdiction to account for further delinquencies discovered by an audit after proper showing by the plaintiff); *Bd. of Trs. v. RBS Wash. Blvd, LLC*, 2010 WL 145097, at *6-7 (N.D. Cal. Jan. 8, 2010) (same).  Finally, courts in this District have granted relief for delinquent contributions that come due after the filing of the complaint, without requiring amendment of the complaint.  *See Local 81 v. Wedge Roofing*, 811 F. Supp. 1398, 1401-02 (N.D. Cal. 1992); *see also Bay Area Painters v. Alta Specialty*, 2008 WL 114931, at *4 (N.D. Cal. Jan. 10, 2008) ("Courts in the Ninth Circuit have made a limited exception to [the requirement that default judgment be constrained by the remedies sought in the complaint] for delinquent contributions that come due *after* a complaint is filed on the basis that such an approach is consistent with the legislative intent underlying ERISA.").  Thus, the Court may grant Plaintiffs the unpaid contributions that were incurred by Nichols, but not discovered by Plaintiffs, before the filing of the Complaint.

The amounts Plaintiffs seek, however, go beyond what they are due.  The documents accompanying Plaintiffs' motion clearly show that Plaintiffs' requested recovery includes unpaid contributions that are owing to *other* trust funds not a party to this case.  (*See* Dkt. No. 83-5, Ex. A (providing table of funds due to non-parties "Defined Contribution Pension Fund," "Hiring Hall," "Industry Fund," and "UA Intl. Training Fund").)  Plaintiffs fail to explain why they are entitled to monies owing to other funds.  At the hearing, Plaintiffs represented that at least one of the funds was a bank account for one of the plaintiffs; however, Plaintiffs conceded that some of the funds were unconnected to Plaintiffs.  Accordingly, the Court orders Plaintiffs to submit to the Court within 14 days of the date of this Order a revised request for unpaid contributions that reflects only the amount owed to Plaintiffs.  Plaintiffs shall explain for each fund or entity they seek to be awarded unpaid

United States District Court
Northern District of California

1  contributions, why Plaintiffs should be awarded that fund or entity's portion of the unpaid

2  contributions.

3        Regarding liquidated damages, Plaintiffs seek liquidated damages for each of the monthly

4  unpaid contributions listed above at a rate of 20%, except for those owed by the Labor Management

5  Fund.[7]  (Dkt. No. 83-1 at 4.)  Section 1132(g)(2) provides Plaintiffs with liquidated  damages and

6  interest as a matter of right on delinquent, unpaid contributions, but the liquidated damages must be

7  equal to or less than 20% of unpaid contributions.  29 U.S.C. § 1132(g)(2); *see also Atoll Topui*

8  *Island*, 2007 WL 174409, at *7.  ERISA requires an award of liquidated damages if "(1) the

9  fiduciary obtains a judgment in favor of the plan, (2) *unpaid* contributions exist at the time of suit,

10  and (3) the plan provides for liquidated damages."  *Idaho Plumbers & Pipefitters Health & Welfare*

11  *Fund v. United Mech. Contractors, Inc.*, 875 F.2d 212, 215 (9th Cir. 1989) (emphasis in original).

12  Plaintiffs have satisfied all three *Idaho Plumbers* factors.  First, by virtue of this order, the fiduciary

13  has obtained judgment in favor of the plan; second, Plaintiffs allege that all the contributions remain

14  unpaid; and third, the MLA provides for assessment of liquidated damages at twenty percent if

15  payment is not made prior to litigation.  However, as discussed above, at least a portion of the

16  unpaid contributions Plaintiffs seek are owed to other funds, and the Court is uncertain whether

17  Plaintiffs have factored those contributions owing to other funds into their liquidated damages

18  calculation.  Plaintiffs' supplemental briefing to the Court shall accordingly include a revised

19  liquidated damages amount consistent with the principal unpaid contributions owed.

20        In addition, the Court concludes that Plaintiffs have adequately supported their request for

21  interest on the unpaid contributions owed to them at a rate of 12% per annum.  The MLA provides

22  that interest will accrue at a rate of 12% per annum.  (*See* Dkt. No. 83-3 at Art. XIX, Sec. 2, Art.

23  XXXIII, Sec. 4.)  Courts in this District have previously upheld higher contractual interest rates in

24  ERISA defaults.  *See, e.g., KMA Concrete*, 2011 WL 7446345, at *5 (1.5% monthly interest); *Bd. of*

25  *Trs. of Laborers Health & Welfare Trust Fund for N. Cal. v. Perez*, 2011 WL 6151506, at *10 (N.D.

---

26  [7]  The Court is unsure why Plaintiffs assert that the 20% liquidated damages provision does not apply
27  to the Labor-Management Fund.  Article XXXIII, the article addressing that fund, specifically says
    that the fund "shall be governed by all of the provisions of Article XIX in the same manner
28  as payments to said Trust Funds."  (Dkt. No. 83-3 at Art. XXXIII, Sec. 4.)  Article XIX is the article
    containing the liquidated damages provision that applies to the other plaintiffs.

United States District Court
Northern District of California

1  Cal. Nov. 7, 2011) (1.5% monthly interest); *Atoll Topui Island*, 2007 WL 174409, at *9 (18% annual

2  interest).  However, to the extent that Plaintiffs seek interest on unpaid contributions owed to other

3  funds not parties to this suit, Plaintiffs have not shown they are entitled to such interest.  Because it

4  appears that Plaintiffs have included amounts owed to other funds in their interest calculation, the

5  Court further orders Plaintiffs to include in their supplemental briefing a revised interest amount.

6  **B.     Audit**

7  Plaintiffs also seek an audit of CRB and, perhaps, Nichols.[8]  "Where a collective bargaining

8  agreement, as here, gives Trustees of an employee benefit plan the right to audit an employer's

9  books and records, it will be enforced."  *Cal. Drywall/Lathing Indus. Labor-Mgmt. Cooperation,*

10  *Inc. v. MLR Drywall Servs. Inc.*, 2010 WL 519827, at *6 (N.D. Cal. Jan. 19, 2010) (citing *Cent.*

11  *States Se. & Sw. Areas Pension Fund v. Cent. Transp. Inc.*, 472 U.S. 559 (1985); *Santa Monica*

12  *Culinary Welfare Fund v. Miramar Hotel Corp.*, 920 F.2d 1491 (9th Cir. 1990)).

13  The MLA requires the employer to submit to an audit at Plaintiffs' request.  Specifically, the

14  MLA provides:

15  The Trust Funds may, from time to time, and in their sole discretion, require any I/E to
    submit to an audit of the I/E's business records, to be conducted by an auditor
16  designated by the Trust Funds. The I/E shall, within twenty (20) calendar days of
    receiving written instructions from the auditor, provide the auditor with all records
17  deemed necessary or relevant to the audit, in the auditor's sole discretion, including, but
    not limited to, state and federal tax returns, payroll records, time cards, DE-6s, W-2s,
18  W-3s, and job descriptions and classifications. If the Trust Funds initiate any litigation
    or arbitration to compel an audit, the I/E shall pay all costs and expenses incurred by
19  the Trust Funds in the action, including, but not limited to, court costs, attorneys1 fees
    and other expenses of the action, as well as the costs of the audit.
20

21

22  (Dkt. No. 83-3 at Art. XIX, Sec. 7).   Because the Court has already concluded that CRB is Nichols'

23  alter ego, the requirements of the MLA apply to Nichols as well as CRB.  *See Resilient Floor*, 630

24  F.3d at 854.  Further, the documents which Plaintiffs seek from CRB are consistent with the types of

25  documents designated for auditing in the MLA.  (*See* Dkt. No. 83-1 at 17.)  The Court accordingly

26  concludes that CRB is required to submit to Plaintiffs' requested audit.  To the extent Plaintiffs seek

27

28  [8]  The heading in Plaintiffs' Motion for the section concerning the audit names only CRB; however,
    the body of that section includes references to Nichols, suggesting that an audit of Nichols is sought
    as well.  (*See* Dkt. No. 83-1 at 16-18.)

United States District Court
Northern District of California

an audit of Nichols, Plaintiffs do not explain why such an audit is necessary given that Nichols already submitted to an audit in June 2012 following the filing of this lawsuit.  If Plaintiffs are seeking to re-audit Nichols, Plaintiffs shall explain in their supplemental briefing why it is necessary for the Court to order such an audit.

## CONCLUSION

Based on the foregoing, the Court orders that Plaintiffs submit supplemental briefing and evidence, within 14 days of the date of this Order, regarding:

1.	The amount of unpaid employee contributions and the amount of unpaid employer contributions for non-union work owed by the individual Defendants to Plaintiffs.

2.	Contributions, liquidated damages, and interest owed to Plaintiffs in this action.

3.	Audit of Nichols.

**IT IS SO ORDERED.**

Dated:  May 31, 2013

_____
JACQUELINE SCOTT CORLEY
UNITED STATES MAGISTRATE JUDGE